199 F.Supp. 544 (1961)
A. C. BECKEN CO., an Illinois corporation, Plaintiff,
v.
GEMEX CORPORATION, a New Jersey corporation, Defendant.
Civ. A. No. 56 C 1962.
United States District Court N. D. Illinois, E. D.
September 29, 1961.
*545 Dixon, Morse, Knouff, Potter & Holmes, Chicago, Ill., for plaintiff-appellant.
Haight, Lockwood & Simmons, Chicago, Ill., for defendant-appellee.
MINER, District Judge.
This matter having come on for hearing pursuant to mandate of the Court of Appeals for the Seventh Circuit (opinion reported at 272 F.2d 1), and the court having considered the evidence already in the record on the subject of plaintiff's damages, and the court having heard and examined the admissible evidence offered by defendant in an effort to affect plaintiff's prima facie proof of damages, and that offered by plaintiff in rebuttal, and the court having heard the arguments of counsel and having read the briefs submitted on the issue now before it, and the court being fully advised, the court enters its findings of fact and conclusions of law as follows:

Findings of Fact

Introductory
1. The evidence in the record concerning many of the factual questions on the damage issue before the court is conflicting and subject to varying degrees of credibility.
2. From an examination and analysis of the testimony and exhibits introduced and admitted into evidence at trial and pursuant to the conclusions of law hereinafter set forth, and from a careful examination of the weight to be accorded each item of evidence, the court finds that
(a) the plaintiff's prima facie estimated loss figure of $56,475.95 must be reduced by (i) a sum attributable to payment of salesmen's commissions not otherwise credited against plaintiff's estimates of gross purchases from defendant to the extent of estimated sales for which such commissions would be payable; (ii) a sum attributable to excessive estimation of increase in plaintiff's *546 gross sales income from Gemex watchbands;
(b) the plaintiff's prima facie loss figure of $56,475.95 should not be reduced by
(i) any sum attributable to asserted general and administrative expense above that already credited by plaintiff against plaintiff's estimates of gross purchases from defendant;
(ii) any sum attributable to asserted cash discounts allowed by plaintiff to its customers;
(iii) any sum attributable to asserted increases in direct selling by defendant to retailers;
(iv) any sum attributable to asserted excessive estimation of cost of handling Gemex watchbands in plaintiff's inventory subsequent to August 2, 1956;
(v) Any sum atttributable to asserted excessive estimation of loss on Gemex watchbands closed out by plaintiff subsequent to August 2, 1956.
(c) the plaintiff's losses of profits on watchband sales for the years in question must be reduced by losses attributable to causes other than defendant's illegal acts.

Salesmen Commission Expense Not Already Deducted
3. Payment of commissions to salesmen on merchandise sold operates to increase plaintiff's otherwise cost of such merchandise and, correlatively, to decrease plaintiff's otherwise profits on such merchandise.
4. Plaintiff ordinarily paid and would ordinarily have paid a 10% commission on sales of watchbands.
5. One-third of plaintiff's sales and projected sales of Gemex watchbands were to an account concerning sales to which plaintiff paid its salesman a 5% commission plus a salary in an amount approximating an additional 5% of gross sales.
6. The Court of Appeals has, in its opinion (272 F.2d at page 5) approved such salary payment as an item of damage, and has reduced it by two-fifths pursuant to a concession by plaintiff referred to in the said opinion. The Court of Appeals having thus considered the salary payment matter in full on its merits and on its facts, this court has no power to make further factual findings as to some other proportion of such salary payment by which plaintiff should be compensated by defendant or, indeed, whether such salary payment was in reality a 5% commission not chargeable as damages.
7. Some sales of watchbands were and would have been attributable to mail order sales on which no salesmen's commissions are paid.
8. The evidence is insufficient to permit a finding as to the exact portion of plaintiff's Gemex watchband sales which were and would have been initiated by mail order, for the reasons, among others, that
(a) within two years after filing the instant suit plaintiff destroyed or otherwise made unavailable all its file copies of sales invoices;
(b) plaintiff's general testimony estimating that only 35% to 40% of its customers were called on by its salesmen in an effort to sell plaintiff's many types of merchandise (some 20,000) is insufficient to warrant the inference either that such customers represented or would have represented that same percentage of gross sales of Gemex watchbands, or that mail order sales receipts from sales of Gemex watchbands represented or would have represented the difference between that percentage and the total of gross sales;
(c) plaintiff's general testimony estimating that 45%, 50% or 60% of its gross sales of all types of merchandise were and would have been mail order sales is insufficient to warrant the inference that mail order sales of Gemex watchbands represented or would have represented that same percentage, and such inference is not credible in view of *547 other evidence concerning the percentage of Gemex watchbands sold to but one account (Field's, 1/3 ) and the plaintiff's ordinary method of operation;
(d) plaintiff has also testified that its net sales of all types of merchandise in the fiscal year ending January 31, 1957, totaled $2,677,523, and that the customers which its salesmen never see account for "thousands of dollars worth of business";
(e) although the evidence is insufficient to permit of such finding, if the court were to consider that plaintiff's percentage of mail order sales of Gemex watchbands was and would have been the same percentage as its mail order sales of all merchandise, and if the court were to construe plaintiff's evidence concerning "thousands of dollars" as meaning a quarter of a million dollars, the said percentage would constitute no more than 10%;
(f) plaintiff has testified that 5% of salesmen's commissions are also paid on mail order sales of Gemex watchbands whenever a customer buys by mail order within six months of the time when a salesman personally secured an order from that customer;
(g) plaintiff's president testified that he could not tell how many sales of Gemex watchbands in 1955 were made without payment of the 10% commission and that any statement by him as to how many "would only be a guess";
(h) plaintiff has itself deducted 4.5% from all estimated gross sales as commission expense without evidence that the said percentage is an overall weighted average representing sales on commission and sales not on commission.
9. Salesmen's commissions in the amount equivalent to 4.5% of net sales have already been deducted by plaintiff in its damage computations as part of "selling, general and administrative expense" totaling an average of 22.5% of sales.
10. An amount equivalent to an additional one-half of one per cent of one-third of the sales income decrease for the loss of profit on which plaintiff should be compensated, must be deducted as additional salesmen's commission expense which was and would have been attributable to that portion of sales income.
11. An amount equivalent to an additional five and one-half per cent of one-half of the sales income decrease for the loss of profit on which plaintiff should be compensated, must be deducted as additional salesmen's commission expense which was and would have been attributable to that portion of sales income.
12. That portion of sales income decrease not affected by the reductions required under findings 10 and 11 (i. e., one-sixth of sales income decrease, or 16 2/3 %) is attributable to sales not on commission.

Projections Of Cost Of Purchases And Gross Sales Income
13. Plaintiff's prima facie estimates of cost of Gemex watchbands it would have purchased from defendant, and plaintiff's projected gross sales income from those goods, based on such purchase estimates for the five fiscal years ending immediately succeeding the August 2, 1956 date of cutoff, were:

 Plaintiff's
 Approx. % Estimated
 increase Plaintiff's Markup Gemex
 over prior Estimated (½ of Gross
Year Ending year Cost Cost) Sales
(a) 1/31/57 50% $ 55,000 $27,500 $ 82,500
(b) 1/31/58 33 1/3 % 73,000 36,500 109,500
(c) 1/31/59 25% 91,000 45,500 136,500
(d) 1/31/60 15% 104,000 52,000 156,000
(e) 1/31/61 15% 120,000 60,000 180,000

*548 14. Plaintiff's actual cost of purchase of, and gross sales income from, all makes of watchbands for the years ending January 31, 1953 through January 31, 1960[1], are as follows:

 Plaintiff's Actual
 Plaintiff's Actual Gross Sales Income
 Cost of all from all
 Year Ending Watchbands Watchbands
(a) Jan. 31, 1953 $ 93,617 $123,020
(b) Jan. 31, 1954 139,844 201,718
(c) Jan. 31, 1955 158,521 209,589
(d) Jan. 31, 1956 180,363 248,293
(e) Jan. 31, 1957 114,365 249,392
(f) Jan. 31, 1958 108,163 176,168
(g) Jan. 31, 1959 101,965 142,695
(h) Jan. 31, 1960 106,868 150,510

15. Plaintiff's actual and projected dollar and percentage increases in gross sales income from sales of Gemex watchbands through its fiscal year ending January 31, 1961, are as follows:

 Actual and Projected Gemex Sales
 Income Increase Year to Year
 Dollar Percentage
 Year Ending Increase Increase
(a) Jan. 31, 1953  
(b) Jan. 31, 1954 $ 1,304 90.68%
(c) Jan. 31, 1955 4,404 173.59%
(d) Jan. 31, 1956 35,777 515.44%
(e) Jan. 31, 1957 [8,733][2][3] [25.78%][2][3]
 39,782 [4] 93.13% [4]
(f) Jan. 31, 1958 27,000 [4] 32.73% [4]
(g) Jan. 31, 1959 27,000 [4] 24.66% [4]
(h) Jan. 31, 1960 19,500 [4] 14.29% [4]
(i) Jan. 31, 1961 24,000 [4] 15.38% [4]
16. Plaintiff's projections of gross sales income and cost of purchases for the fiscal years ending January 31, 1957 through January 31, 1961, are predicated upon yearly percentages by which plaintiff estimated those items would increase.
17. The said estimated yearly increase percentages were applied on actual purchase and sales figures for the first half of the fiscal year ending January 31, 1957, and on estimated purchase and sales figures for the second half of that fiscal year.
*549 18. Plaintiff's actual sales income from sales of Gemex watchbands to the date of cutoff accounted for the following percentages of plaintiff's actual sales income from sales of all types of watchbands:

 Percentage Attributable
 Gross Sales Income to Sales of Gemex
 Year Ending from all Watchbands Watchbands 
 (a) Jan. 31, 1953 $123,020 1%
 (b) Jan. 31, 1954 201,718 1.3%
 (c) Jan. 31, 1955 209,589 3.3%
 (d) Jan. 31, 1956 248,293 17.2%
 (e) Jan. 31, 1957 249,392 13.6% [5]
19. Plaintiff's estimated sales income from projected sales of Gemex watchbands would, if accurate, have accounted for the following percentages of plaintiff's actual-plus-estimated sales income from sales of all types of watchbands:

 Total of Actual Plus Percentage Attributable
 Plaintiff's Estimated to Plaintiff's Estimated
 Sales Income from Sales of Gemex
 Year Ending all Watchbands Watchbands 
 (a) Jan. 31, 1957 $297,927 27.7%
 (b) Jan. 31, 1958 285,668 38%
 (c) Jan. 31, 1959 279,195 49%
 (d) Jan. 31, 1960 301,510 51%
 (e) Jan. 31, 1961  [6] 

20. Plaintiff's projections of purchases and sales of Gemex watchbands for the fiscal years ending January 31, 1957 through January 31, 1961, are excessive and inaccurate.
21. Defendant concludes from various figures, computations, and views of the law applicable to this case, that plaintiff's losses attributable to defendant's illegal acts total no more than $3,419.82.
22. Defendant's projections, for the years in question, of plaintiff's losses attributable to defendant's illegal acts are inadequate and inaccurate.
23. Plaintiff's purchases and sales of Gemex watchbands in the fiscal years ending January 31, 1957 through January 31, 1961, would have been not substantially greater nor substantially less than the following:

 Approx. %
 Increase over Gross
 Year Ending Prior Year Cost Markup Sales
 (a) Jan. 31, 1957 33 1/3 % $50,000 $25,000 $ 75,000
 (b) Jan. 31, 1958 20% 60,000 30,000 90,000
 (c) Jan. 31, 1959 10% 66,000 33,000 99,000
 (d) Jan. 31, 1960 5% 70,000 35,000 105,000
 (e) Jan. 31, 1961 5% 73,000 36,500 109,500

*550 24. Including the figures set forth in finding 23, plaintiff's cost of purchase of, and gross sales income from, all makes of watchbands, for the fiscal years ending January 31, 1953 through January 31, 1960,[7] were and would have been as follows:

 Plaintiff's Gross
 Plaintiff's Cost of Sales Income from
 Year Ending all Watchbands all Watchbands 
 (a) Jan. 31, 1953 $ 93,617 $123,020
 (b) Jan. 31, 1954 139,844 201,718
 (c) Jan. 31, 1955 158,521 209,589
 (d) Jan. 31, 1956 180,363 248,293
 (e) Jan. 31, 1957 146,905 290,427
 (f) Jan. 31, 1958 168,163 266,168
 (g) Jan. 31, 1959 167,965 241,695
 (h) Jan. 31, 1960 176,868 255,510

25. Based on the figures set forth in finding 23, plaintiff's income from sales of Gemex watchbands would have accounted for the following percentages of plaintiff's sales income from sales of all types of watchbands:

 Gross Sales Percentage Attributable
 Income from all to Sales of Gemex
 Year Ending Watchbands Watchbands 
 (a) Jan. 31, 1957 $290,427 25.82%
 (b) Jan. 31, 1958 266,168 33.81%
 (c) Jan. 31, 1959 241,695 40.96%
 (d) Jan. 31, 1960 255,510 41.09%
 (e) Jan. 31, 1961  [8] 

26. The extreme increases, both in percentage and in absolute gross sales income, for the fiscal years ending January 31, 1955 and January 31, 1956, were attributable in large part to sales and projected sales to one account, Marshall Field and Company, which account defendant had given to plaintiff in the fall of 1954.
27. The said increases in plaintiff's gross sales income for the fiscal years ending January 31, 1955 and January 31, 1956, were not solely due to the efforts of plaintiff in promoting the sale of Gemex watchbands.
28. The actual decreases in plaintiff's yearly sales income from sales of all makes of watchbands between the fiscal years ending January 31, 1957 and January 31, 1961, were due in large, but not in sole, measure to defendant's August 2, 1956, cutoff of Gemex watchbands.
29. Defendant presented uncontroverted evidence showing decreased purchases of Gemex watchbands by plaintiff's competitors in the years following 1956, including the experience of one competitor who took over the Field account from plaintiff.
*551 30. Defendant presented uncontroverted evidence showing that defendant reduced its advertising and promotion expenditures in years following 1956, but presented no evidence to explain the reason for such reductions.
31. Defendant's reduction in advertising and promotion expenditures had the effect of reducing the general market for defendant's Gemex watchbands.
32. In order to determine whether the post-1956 decreases in the general market for Gemex watchbands were natural decreases (which would have also affected plaintiff's gross sales income), rather than artificially created decreases caused or promoted by defendant in an attempt to insulate itself from the accumulation of damages attributable to its August 2, 1956 cutoff (which should not be considered to reduce plaintiff's damages), the court has evaluated the evidence concerning the said decreases, the evidence concerning defendant's proved reductions in such expenditures, and the evidence concerning the probable effectiveness of plaintiff's own advertising and promotional activities in counter-acting declines in its product market.
33. Plaintiff is entitled to be compensated for loss of profits attributable to the following portions of plaintiff's gross sales income decrease with respect to Gemex watchbands:

 Gross Sales Compensable Portion
 Income from of Sales Income
 Year Ending all Watchbands[9] Decrease 
 (a) Jan. 31, 1957 $ 41,035[10] $37,931
 (b) Jan. 31, 1958 90,000 81,000
 (c) Jan. 31, 1959 99,000 88,100
 (d) Jan. 31, 1960 105,000 94,500
 (e) Jan. 31, 1961 109,500 98,550

Damages
34. Plaintiff's gross profit loss, based upon the figures in finding of fact 33, is as follows:

 Year Ending Gross Profit Loss[11]
 (a) Jan. 31, 1957 $3,028.31
 (b) Jan. 31, 1958 6,466.83
 (c) Jan. 31, 1959 7,033.68
 (d) Jan. 31, 1960 7,431.91
 (e) Jan. 31, 1961 7,868.87
 _________
 $31,829.60

*552 35. From the gross profit loss figures set forth in finding of fact 34, there must be deducted amounts computed pursuant to findings of fact numbers 10 and 11, as follows:

 Compensable
 portion of
 sales income Finding 10 Finding 11 Total
 Year Ending decrease[12] Deduction Deduction Deduction
 (a) Jan. 31, 1957 $37,931 $ 63.22 $1,043.10 $1,106.32
 (b) Jan. 31, 1958 81,000 135.00 2,227.50 2,362.50
 (c) Jan. 31, 1959 88,100 146.83 2,422.75 2,569.58
 (d) Jan. 31, 1960 94,500 157.50 2,598.75 2,756.25
 (e) Jan. 31, 1961 98,550 164.25 2,710.12 2,874.37
 __________
 $11,669.02

36. The actual profit loss for sales lost by plaintiff, for which plaintiff should be compensated, is as follows:

 Year Ending Profit Loss
 (a) Jan. 31, 1957 $1,921.99
 (b) Jan. 31, 1958 4,104.33
 (c) Jan. 31, 1959 4,464.10
 (d) Jan. 31, 1960 4,675.66
 (e) Jan. 31, 1961 4,994.50
 _________
 $20,160.58

37. Plaintiff's compensable damages sustained by reason of defendant's August 2, 1956 cutoff, total $24,764.68. This total includes the amount found by the court to be due on account of compensable profit loss ($20,160.58), the amount attributable to freight charges paid by plaintiff for shipping Gemex catalog inserts ($131.87), printer's handling charge paid by plaintiff for sending catalog inserts to another printer ($27.30), plaintiff's handling and shipping charges concerning Gemex merchandise left in stock ($1,658.78), plaintiff's handling charge for closed-out Gemex merchandise rejected by Gemex ($645.41), plaintiff's costs of close-out advertising and postage ($470.65), plaintiff's profit loss on closed-out Gemex merchandise ($1,202.09), and plaintiff's loss of benefit of promotional expense concerning Marshall Field & Company account ($468.00).
38. Plaintiff's compensable damages, as trebled, total $74,294.04.

Conclusions of Law
1. Plaintiff's prima facie proof of losses sustained subsequent to defendant's unlawful refusal to continue selling Gemex watchbands to plaintiff, heretofore confirmed as valid by the Court of Appeals (272 F.2d at page 5), totals $56,475.95.
2. The actual damages sustained by plaintiff must be computed and assessed by deducting from the prima facie total of losses, such portions thereof, if any, as are proved attributable to factors (a) unrelated to defendant's unlawful *553 acts, and (b) the joint and several impact of which is not magnified by defendant's unlawful acts or losses attributable to such acts.
3. When estimates of general market conditions, profit percentages, future purchases, the effect of advertising and promotional expenditures upon sales, and the effect of direct selling by manufacturers to retailers, have some valid basis in fact, they are admissible to rebut prima facie damage proofs which themselves are based upon estimates.
4. The weight to be accorded evidence which is based upon estimates and admitted to rebut prima facie proof also based upon estimates depends upon an evaluation of the relative probabilities that one party's estimates will prove more accurate than the others.
5. An evaluation of the probability that estimates of future losses would prove accurate requires an examination of all relevant measurable factors which are not themselves based upon estimates.
6. Evidence of market trends, sales and purchase figures, and advertising and promotional expenditures, are among the factors to be examined in evaluating the probability that estimates of future losses would prove accurate.
7. When a defendant manufacturer guilty of an unlawful refusal to sell, subsequently causes or contributes to a decrease in the plaintiff wholesaler's product market by certain acts or changes in its ordinary business activities which are not shown to have been required by business circumstances, the amount of the plaintiff's future sales income and profits lost by reason of defendant's wrongdoing is to be computed without regard to that portion of the decreased market attributable to defendant's acts.
8. Nothing in the Court of Appeals mandate and opinion restricts defendant from introducing actual sales and market figures to rebut plaintiff's estimate of damage based on sales and market projections.
9. Where, because of an intervening appeal or for other reason, hearing on the damage issue in a case is spread over a lengthy period, evidence of actual occurrences and experiences between the first and the last hearings is admissible for the purpose of confirming or impeaching the estimates of future damage introduced at the first hearing.
10. Destruction or other disposition of records by a party during pendency of a suit to the damage issues of which such records have clear relevance, is a fact which may be considered by the court in determining the accuracy of and weight to be given to that party's evidence on those issues.
11. The evidence concerning a purported offer by defendant in April 1958 to resume dealing with plaintiff is insufficient to prove (a) that defendant made a bona fide attempt to purge itself of the effects of its illegal refusal to deal, or (b) that the illegal refusal to deal then no longer existed, or (c) that plaintiff was thenceforth restored to its former position.
12. An offer to deal by one who has theretofore illegally refused to deal will not operate to terminate the right of an injured buyer to recover for losses sustained past that time, when there is insufficient proof that (a) the newly offered relationship will make the injured party whole, (b) there are no residual damage effects attributable to the original refusal to deal, and (c) the offer is made in good faith and on lawful terms.
13. The damages which may be recovered by one who has sustained injury by reason of a refusal to deal which violates the antitrust laws, are not limited to damages actually sustained to the date of filing of the complaint or of a subsequent supplemental complaint.
14. The Court of Appeals mandate and opinion pursuant to which this court now acts controls the disposition of this cause insofar as the words of the Court of Appeals state conclusions of *554 law expressly or by necessary implication.
15. The Court of Appeals, in its consideration of the appeal heretofore prosecuted in this cause, expressly approved both the general method by which plaintiff computed losses expected for a period of years subsequent to the filing of the complaint, and the admissibility of such expected losses as prima facie proof of damages.
16. This court, pursuant to mandate of the Court of Appeals, has found as a fact that plaintiff has suffered damages by reason of defendant's illegal acts in the amount of $24,764.68. This court concludes as a matter of law that plaintiff is entitled to recover from defendant in this proceeding, as treble damages, the sum of $74,294.04.
NOTES
[1] Actual watchband cost and sales income figures for fiscal year January 31, 1961, were not available at time of hearing.
[2] Decrease.
[3] This dollar amount and percentage is computed solely from gross sales for the first half of this fiscal year, i. e., Feb. 1, 1956 to August 1, 1956. The cutoff occurred on August 2, 1956.
[4] Both dollar and percentage figures are based solely on plaintiff's projected gross sales income for the full fiscal year.
[5] To date of cutoff.
[6] Actual sales income figure for this fiscal year was not available at the time of hearing.
[7] Actual watchband cost and sales income figures for fiscal year ending January 31, 1961 were not available at time of hearing.
[8] Actual sales income figure for this fiscal year was not available at time of hearing.
[9] From finding of fact 23.
[10] Computed by deducting actual sales during the cutoff year from total sales, i. e., $75,000 less $33,965.
[11] Computed as bearing the same proportion to compensable sales income as plaintiff's estimated profit loss for fiscal year ending January 31, 1957 ($4,391.06) bears to plaintiff's estimated gross income loss for fiscal year ending January 31, 1957 ( 2/3 ($55,000 cost plus $27,500 markup) = $55,000.).
[12] From finding of fact 33.